The first case on this afternoon's docket is the case of Jenna Lilley v. Career Education Corp. We have Mr. John Carey for the—oops, we got them mixed up, don't we? We have Michelle Odorizzi for the appellants, and we have Mr. John Carey for the athletes. And you may proceed, Miss Odorizzi. Good afternoon. We have in this court Michelle Odorizzi on behalf of Defendant Sanford Brown v. Career Education. Whether or not a class was properly certified in this case turns on pure questions of law. And that is, what are the elements that plaintiffs have to prove in order to recover on their claims under the Schools Act and under the Consumer Fraud Act? Plaintiffs persuaded the Circuit Court to certify the class on the theory that to recover under those two acts, under the Schools Act, all they had to prove was a violation of the Act or the rules and regulations promulgated under it. Or that to recover under the Consumer Fraud Act, all they had to show was an omission that would have been material to the hypothetical reasonable person. But that's wrong as a matter of law. Showing a violation of the Schools Act or the Consumer Fraud Act is only step one in determining whether members of this class are intended to recover. Plaintiffs must also prove for each and every member of the class that the violation resulted in damages and that the damages they seek were approximately caused by the violation. So if what plaintiffs want in this case, and I'm not sure from their brief if they're still asking for it, but if they want a refund for each and every person who was enrolled in the M.A. program at Sanford Brown during this seven and a half period, then they would have to prove at a minimum that each of those class members would not have enrolled but for the violation. And proving that for 2,000 individuals over, as I say, the course of seven plus years would require 2,000 mini-trials, meaning that there would be no predominance and that the individual in questions would swamp any supposed common issues. Now if I may, I'd like to go back to the Schools Act. The Schools Act creates a private right of action for any person who suffers damages as a result of a violation of this Act. The plain language of the Schools Act requires the plaintiffs to prove three things, a violation, damages, and a causal relationship between the violation and damages. The circuit court, however, accepted the plaintiff's argument that these three elements can be collapsed into one because, the plaintiff's argument, that by depriving them of the protections afforded by the Act, the defendant necessarily caused them damages. So in their view, violation means damages means causation without having to prove anything. And that's just wrong. The Schools Act does not make every student a private attorney general and give them the right to sue for any violation that they may encounter. Instead, it gives them only the right to sue in the event that they suffer damages as a result of the violation. And there's a good reason for that. And that's because the Act itself creates a very comprehensive regulatory and enforcement scheme under which you have the State Board of Education, the State Superintendent of Education, the Attorney General, and state's attorneys who have both the responsibility and the right to bring actions for and to seek enforcement of the Act. And they have the right to do that whether or not anyone is a victim. The General Assembly decided that private individuals would have a much more limited right. It patterned that right after the private right of action in the consumer trial, which only applies if the plaintiff can show that they suffered damages resulting from the violation of the Act. Now, plaintiffs say in their brief that damages means money, means pecuniary harm. And we agree with that. And this particular Act says the plaintiffs have to show damages resulting from the violation. And the Supreme Court has said in case after case that the words resulting from impose an obligation to prove causation. And as Your Honors know, in a series of Supreme Court decisions dealing with the Consumer Fraud Act and deceptive marketing, the Supreme Court has made it clear that the plaintiffs, even in a class action, each and every member of the class must be able to show that they saw the deceptive marketing, they were deceived, and that they would not have engaged in the transaction in question but were in violation. So when you apply that construct here to the Schools Act, you can see that plaintiffs are wrong, that the Supreme Court was wrong, that it's not enough to show a violation. And at the end of the day, the damages they seek have to be causally related to the violation. And I think there are three theories that they raise in the Schools Act. Their first claim is that defendants made misrepresentations in placement statistics that were provided along with each enrollment agreement. They also have an alternative argument, which they are now relying more on on appeal, which is that there was an obligation under the rules and regulations to have every admissions representative explain those statistics to prospective students. So plaintiffs say they can prevail, although they don't say on appeal what they think their damages would be. But they say they could prevail simply by showing that placement statistics were wrong in some way, or by showing that there was a policy not to explain them. Now I should divert for a second here to say that to the extent plaintiffs say that there was a violation of the regulations, which is their argument that the admissions representatives had to explain placement statistics, they don't have a right under the Act to bring claims for violation of the rules and regulations. The private right of action provision, section 26.2, says that private individuals have a right to bring claims for damages resulting from violations of the Act. It says nothing about the rules and regulations. And that's not a mistake. That's not an oversight on the part of the General Assembly. If you look at section 26.1, and that's on page 30 of our appendix, you will see that when they were giving enforcement powers to the Attorney General and to the state's attorneys, they have a right to seek an injunction for either a violation of the Act or a violation of the rules and regulations. But private individuals are allowed only to seek damages if they can show that they have damages resulting from a violation of the Act. And I think you have to apply the plain meaning so that to the extent their claims here are based on plain violations of the regulations, it fails. Couldn't you consider in determining whether there was a violation of the Act, whether there were violations of the regulations? Well, the Act and the regulations really do have separate obligations. For example, the Act does require that they disclose placement statistics and that they be appended to the enrollment agreement, which was done in this case. Now, plaintiffs say that if you look under the regulations and the list of what an admissions representative is supposed to do, that it also says that they should explain those statistics. Well, there's no statutory obligation to explain the statistics. The only obligation is to give accurate statistics to people in the enrollment agreement. So that's not a violation of the Act. We doubt it's a violation of the regulations, which are at best ambiguous about what an admissions representative should do. But not every violation of the regulations gives rise to a claim. I think also the screening argument, which is the plaintiff's second argument, is a good example of that. The Act says you must screen applicants for admission. So you have to give them a test. There's no doubt that tests were given here. They gave what's called a CPAT test, which basically tests for basic skill levels, high school level, in terms of reading, writing, reasoning skills. Now, if they had not done that, given those tests, that would have been a violation of the Act. But plaintiffs look at the regulations, which talk about the admissions tests, and they say, look at those tests, you're supposed to validate it somehow. And I have to admit, I don't really understand what their argument is. But they apparently think that it should be more than just a test that tells whether you can perform at high school level. It should be an aptitude test, perhaps. So as long as you give them a test, whatever they're testing, then you've satisfied the statute, even if it's a poor test. Even if it's a poor test, that's right. And under the rules and regulations, perhaps if the superintendent believes that they're not doing proper testing, the superintendent can come in and has plenty of power to do something about it. So would the attorney general. So would a local state's attorney. If they really think you're letting in people, you've set the bar way too low, and you're letting in people who shouldn't be in this particular course. Do you think when the legislature drafted this statute, they just wanted you to give them some kind of test, not that the purpose of that test was to get in qualified applicants? Well, I think that they said you should have a screening test, which they did. And we, by the way, do not think that the regulations require what plaintiffs say they require either. But in any event, a violation of those regulations to say this isn't a properly validated test would put you in a position of having a judge or jury decide after the fact whether you've made a proper educational decision. That's the kind of thing that the superintendent should be making. So when you see those, you see you're allowed to sue for violations of the Act. It can't include violations of these kinds of regulations. So that would take out their whole screening claim entirely out of the case, because it's all based on the regulations. I should also say that, again, we don't believe that they're reading the regulations right, and to the extent they say that everyone is entitled to a refund if the test wasn't properly validated. That's clearly not right under the regulations either. The regulations simply provide for refunds in the event someone withdraws and they haven't been given a screening test. If you were allowing people to pay tuition to go to your school who were totally unqualified to pass the courses and also flunk the courses, don't you think they would be entitled to damages under this provision of the Act? I don't think they can get it through the idea that the screening test wasn't sufficiently validated, the plaintiff's theory. But even if they could, Your Honor, under the theory that the screening test does invoke the regulations,  that may be, but at least there would be a way to proceed. Right, but there would be on each case, there would be an individualized determination. You would have to figure out what should the test have been and could they have passed. And in this case, you had at least one or two of the named plaintiffs who testified that they certainly thought they were smart enough to get through the course. I believe one of them graduated. So that would be an individualized issue, even if they could go ahead and look at the regulations. And the same is true of the placement data. Whether or not people, you have a threshold issue here as to whether or not people saw the placement data, understood it, read it, talked to the admission representatives about it. You can see that the testimony of the named plaintiffs is that they had discussions about those issues. At least one of them said the admissions representative told her something different than what was on the form. So we have a whole series of people who have different understandings of placement statistics. And then you have the question of whether those placement statistics made any difference to them in terms of their decision to enroll in the school. The trial judge here said, and I think he's absolutely right, that if somebody went to the school, they graduated, and they got a job in their field, they can't possibly claim, even if the placement statistics were wrong in some way, they can't possibly claim that they suffered any damages as a result of that. Do you think the plaintiff's theory would allow a person like that to recover damages? Yes, Your Honor, I do. I think their argument is, and of course we can't figure out why an individual failed to graduate unless we look at their individual facts. Did it have anything to do with the placement rates? Did it have anything to do with the screening? Or did they just not work very hard? Or did they just decide midway that they weren't interested in it? You would have to look at each individual circumstance to see why it was they didn't finish up the course. But if you finished the course, that's what I'm talking about. Somebody who was happy, you made reference to somebody that was happy with the course, got a job, and was very complimentary, under the plaintiff's theory, would they still recover? I believe so, Your Honor. At least on the theory in the circuit court, which was that everybody gets a refund if we can prove any violation. And if that's not their theory, the problem is how do you sort out who has a claim and who doesn't without looking at each individual? One of the things we pointed to is, as Your Honor says, we had four affidavits from people who did finish the course and who managed to get jobs in their field and were happy with their education. And as to any individual, there would be the question, even if they saw the statistics and the statistics were wrong, would it have made a difference if they had seen the right ones? Because these statistics that are attached to the enrollment agreement do not show that this is a guaranteed situation. They show that only 40% of the people graduated, and of those, 74% got a job. And that starting salary was about $18,800. So you could see that people who read that understood that a lot of people did not succeed on this. So the question is, would it have made a difference to them if they had known that it was different, a slightly lower number? Again, that's an individualized determination. Plaintiff's third argument is that the admissions representatives, and there were 53 of them during this seven-year period of time who dealt with the MA students, that at least some of them, the ones that they got affidavits from, did not actually ever read the rules and regulations. And on the enrollment form, they're required to certify that they've read the rules and regulations and that they've abided by them. And plaintiff says, well, if I can show that there wasn't, you know, that they weren't counseled by a qualified admissions representative, then what? Then I win? I get a refund? That was the theory below. But again, they can't show that they were injured unless they can show that the fact that the certification was wrong injured them in some way, that they would have acted differently, that the particular admissions representative said something to them that was not right. And that's a highly individualized determination. So having the Schools Act doesn't help plaintiffs here get to where they need to go on client certification. Plaintiffs have a backup argument, and they say, well, if we have material omissions, we can still sue under the Consumer Fraud Act, because for that, we don't have to show deception and causation. I think they recognize that under Oliveira and that whole line of cases, that if they've got a material misrepresentation claim under the Consumer Fraud Act, that they can't have a class, because there's individualized issues as to who saw what and whether they relied on it and whether they were deceived by it, what action they took based on it. So they say, but we have an omissions claim. But the interesting question is, what's the omission here? The omission, according to them, is a failure to disclose accurate information. Well, there was a disclosure on placement limits, for example. And what they're trying to do is turn an affirmative representation into an omission by saying they omitted to state the true facts. You can't do that. It's just slight of hand. But even if you could do it under the Illinois cases, even when you have an omission case under the Consumer Fraud Act, you still have to prove that element of causation. And the plaintiffs have not cited, and I don't think there is an Illinois case that says that you can prove that in a class case by asking the jury whether or not a reasonable person would find the particular fact material. Instead, the cases, Connick and all of its progeny, talk about the fact that the plaintiffs had alleged that they would not have bought the particular car or they would not have engaged in the particular transaction had they known the truth. And in those cases, the court said, well, that's enough because you are alleging the necessary element of causation. But again, that's going to be individualized, particularly here where what you're talking about is placement statistics. If there's a material omission with respect to placement statistics, it's not clear that each person would have acted differently had they known the truth. Because we know from the record that people enroll in college in these courses for a variety of different reasons. Some may have thought it was that the placement statistics were important, some may not. Therefore, you can't do it for each one. You will have the opportunity for rebuttal. Thank you. Thank you, Mr. Carey. Good afternoon. May it please the court, opposing counsel, whole counsel. My name is John Caron. I represent the four named plaintiffs and class representatives in the class in this case. The sole issue in this Rule 411A interlocutory appeal is whether the circuit court, Judge Stack, abused his discretion in certifying this very narrow class. The law is very clear that decisions regarding class certification rest within the sound discretion of the trial court. And the standard of review in this court is whether Judge Stack abused his discretion in certifying this class. As this court is aware, class certification orders can always be modified. The court can even decertify the class if the circumstance is warranted, particularly when class certification rulings are encouraged early in the case rather than later. It's important that in close cases, and I don't think this is even a close case, that the court should err in favor of granting certification. Now, it's important to emphasize that this is an extremely narrow class. The class involves a single campus owned by Sanford Brown located in Collinsville, Illinois. It involves only a single program at the Collinsville campus, specifically the medical assistant program. This is not a nationwide class. It does not even involve the medical assistant program at numerous other campuses that these defendants own. I don't know how we could have made this class any more narrow than it is. And this narrow class does not even remotely resemble the cases or the classes in the cases cited by defendants, where the classes were usually nationwide, extremely amorphous such as light cigarette smokers, purchasers of premium gasoline, aloe vera, or people who supposedly had non-OEM parts placed in their car, that would be Avery. This is not a fraud on the market case. Instead, there are only 2,000 class members, all of whom are easily identifiable, the class is manageable, and the damages are easily calculable and are set forth in the regulations promulgated under this act. As this court is probably aware, for-profit schools such as Sanford Brown and its parent corporation, Career Education Corporation, are under intense scrutiny and increasing public criticism. These for-profit schools are not like SIU or the University of Illinois. Their goal is to get in as many students as they can and make a profit. And one of the criticisms of those, they spend more money recruiting these young people than they do educating them. What they do is they prey upon, all too often, minority, disadvantaged students who take out student loans under the guise of this school is going to offer me a career and a high-paying job. In reality, what happens is, if they do manage to finish the program, they don't get the career they were promised, they don't get the high-paying job they thought they were going to get, and they're saddled with all these high student loans which they don't have the ability to repay. Now, we presented evidence to the trial court in this case in the form of affidavits and deposition testimony from current and former employees of Sanford Brown's Collinsville campus. And these people testified that they were actually paid a bonus based upon the number of students they were able to enroll in the medical assistant program. And if they didn't meet their sales quota for a particular period, then they would be fired. It was in response to these concerns that in 1988, the Illinois legislature passed what's called the Private Business and Vocational Schools Act. The act only applies to for-profit schools, and it is undisputed that it applies in this case. And the legislature specifically stated the purpose of the act, to protect the citizens of the state of Illinois and to facilitate and promote quality education and responsible, ethical business practices in the vocational schools. That was the purpose of the act. The act was specifically designed to protect people, such as the plaintiffs and the class members, from unethical business practices. It's important to emphasize, and again, this is undisputed, the act specifically provides for a private cause of action for violations of the act. It says, any person who suffers damages as a result of a violation of this act committed by any school or its representative may bring an action against such school. The court's discretion may award actual damages, trouble damages if fraud is proved, injunctive relief, and any other relief which the court deems proper. And Justice Donovan, you asked opposing counsel about what do you need to prove. There's no mention of causation or reliance in this statute. It says if there's a violation of the act and you've been damaged, these students have the right to bring a private cause of action against the school, which is exactly what we did here. The regulations that were promulgated under the statute even set forth what an appropriate measure of damages is, at least in cases where there's allegations that the campus didn't properly screen the applicants. Keep in mind, they're encouraged, they're sales reps, basically to keep their job, to give bonuses, to get as many people in as possible. And sometimes they would admit people that had no business being in any type of medical assistance field. They had very little chance of ever finishing the program and virtually no chance of ever gaining meaningful employment. But the regulations under the act state that a school shall refund all monies paid to it if the school did not screen the student to determine that the student meets its admission standards prior to the date of the student's acceptance. And what we submit is that the appropriate measure of damages, if violations of the act are indeed found, is a refund of the tuition of these students because they wasted 18 months of their life, took out loans in most cases for $16,000 to $18,000, and they were never able to get a job. And they basically got a worthless piece of paper. They had no chance of ever getting a job in the medical field. Now the act and the regulations impose very strict obligations on these for-profit schools. And perhaps the most important one and the disclosure requirement that I think is at the centerpiece of this case includes the disclosure of placement data. You have to have full and adequate disclosure about the percentage of students who were placed in the field of study for which they were enrolled and the percentage of students who used Samford Brown's placement assistance. The key point is you have to be placed in your field of study. Getting a job as a waitress at Applebee's does not count. That's not being placed in your field of study, which in this case is medical assistance. Getting a job, if you're lucky enough, through a 1M is not being placed through Samford Brown's placement program. Samford Brown's medical assistance program, by their own statistics, had a successful completion rate of only 40%. That's according to their stats. Of the minority of the students who did graduate, Samford Brown claimed that 74% actually got jobs in the medical field. That is completely incorrect. We have evidence that was presented to the trial court from the former director of placement at the Collinsville campus of Samford Brown. He said that they used a 20-20 rule to determine placement. If you spent 20% of your employment in your course of study, in this case medical assistance, and 20% of your time working was in that, then it was covered. Part-time and temporary employees were counted as placed. Employees who had their jobs for only five days were counted as placed. The placement director testified that he had sole discretion to determine whether somebody was deemed placed in their field. In short, the placement statistics given by Samford Brown were greatly inflated, and the defendants, in violation of the act, never disclosed to the plaintiffs and all of the class members what the true placement rates were. Now, in their brief, the defendants described Career Education Corporation as one of the largest and fastest-growing proprietary school owners and operators in the world. We agree. Unfortunately, just this last August, the defendants had to issue a public press release to its shareholders in which they acknowledged improper practices at certain of its health education segment campuses relating to the determination of reported placement rates. The exact quote in the defendant's own press release is, Career Education Corporation has identified improper practices at certain of its health education segment campuses that would include the Medical Assistance Program at Collinsville relating to the determination of reported placement rates. They admitted this. That is this case in a nutshell. And then the press release goes on to further state that they hired independent legal counsel to prepare a report and get back to it. And I'd like to say that this lawsuit brought this about, but the press release says it was a subpoena issued by the New York Attorney General's Office that prompted this investigation and this admission that they engaged in improper practices, to use their words, at their medical assistance facilities concerning the disclosure of placement rates. Alex, it appears that your case is complete before the first day of class, in effect. Everything you're talking about took place before the first day of class. And whether you're successful or not does not depend on whether they completed the class and got a job or didn't complete it and didn't get a job. So I ask your opposing counsel, if somebody is subject to these violations but still takes the course, still graduates, still gets a job, are they a member of your class and they are entitled to have their tuition refunded? They are a member of the class. And they were victims of this statutory violation. However, it is an opt-out class. So any student, and they were able to find four out of 2,000 who submitted affidavits saying that they were happy with the program. That's not surprising out of 2,000 people. Those people who graduated have the right to opt out of the class. But the short answer to your question, Justice Donovan, yes, technically they are members of the class. The defendants somehow attempt to impose some additional obligations on the plaintiffs to prove causation. However, it defies logic and common sense, and it's completely contrary to the language of the statute. If you are making a decision whether to attend a vocational schools program and the school admittedly oments to provide accurate information about the actual placement data and even deliberately overstates the amount of students who were placed in a uniform fashion, it is difficult to conceive, whether you're talking about the Consumer Fraud Act or the statute, how this does not create a cause of action. And this is particularly true when the Illinois legislature passed a law specifically designed to prevent these very types of abuses. Now, the real issue in this case, and the defendants studiously avoid this, are the requirements of the class action statute satisfied in this case. And they didn't even address it in their briefs. Rule 5.2801 sets forth the requirements. Numerosity. It's a narrow class. We have 2,000 class members, certainly too many to join in a single lawsuit, especially when you're talking about trying the exact same case, alleging the exact same statutory violation. So the numerosity requirement is easily satisfied. The second requirement is commonality. And that basically boils down to are there either common questions of law or fact that predominate over any individual questions affecting the class members? And, of course, we have a statutory violation here. And this is usually the predominance test is usually the big issue in all class actions. And I would suggest to the court that not only do the common issues of both law and fact in this case predominate, they literally dwarf any individual issues which may exist. Now let me talk about the common issues other than the statute, which we've talked about in length. This is not a case about alleged oral misrepresentations. And I want to make that very clear. The enrollment agreement, which each and every class member was required to sign before enrolling in the medical assistant program, specifically states as follows. And they all signed this, every single student, every single class member. I further acknowledge that no oral representation was made to me regarding the percentage of graduates employed or starting salaries has been made to me by any representative or employee of the college. So this is not a case about oral misrepresentations. It's not what might have been said to these students when they were being interviewed and enrolled in this process. It's not an oral representation case. That's specifically stated in the enrollment agreement. The enrollment agreement, and that's the key operative document when a student decides to enroll at Sanford Brown, was the same for each and every class member. It didn't change. It didn't vary. The defendants acknowledged that every single class member got the exact same standard enrollment agreement. And the Private Schools Act specifically provides what must be included in the enrollment agreement, including detailed information about placement, how many students were placed in their field of study, and how many students got their jobs through the Sanford Brown placement office. The statute and the regulations they're under also requires that the admissions representative or the sales representative go over the enrollment agreement, including the placement data, on a line-by-line basis. Now, I heard opposing counsel say, well, that obligation's in the regulations, not in the Act. But the regulations are hand-in-glove with the Act. And the superintendent cannot pass regulations that exceed his or her authority under the Act. So any violation of the regulations which are promulgated under the Act and expressly pursuant to the Act are effectively violations of the Act itself. Given this requirement that they disclose line-by-line what's in the enrollment agreement, I find it somewhat odd in the brief that they try and point out, well, some of the class representatives may not even have read the enrollment agreement. If that's true, then that's another violation of the Act by the defendants, because they were required by law to specifically go over this enrollment agreement line-by-line. They used the exact same flip chart in the presentation. The evidence is they weren't allowed to deviate whatsoever. They used the exact same interview script. Again, the evidence, uncontroverted, was that they weren't allowed to deviate from that. There were strict procedures, written documents, protocol that applied to each and every class member universally in this case. So we would suggest that the predominance test is easily satisfied in this case. Thank you, Your Honor. Thank you, Mr. Carey. Ms. Odorisi, do you have rebuttal? Thank you, Your Honor. To pick up what counsel just said, the evidence here is that there were variable representations. None of the named plaintiffs testified that they had actually read their enrollment agreements, and at least one of them testified that she had received representations that differed from the written materials. So for every individual, there's a question of what they heard and understood. Counsel said there's no mention of causation in the Schools Act, but the Schools Act says anyone can sue if you suffer damages as a result of a violation of the Act. And the Supreme Court has been very clear that the words, as a result of, require proof of causation. He also said that this is a very narrow class. It's not a nationwide class like Avery was, but this class is much different than the class in Smith, where the Supreme Court said you could not have a class from the explosion of the railroad car because issues of proximate cause and damages would overwhelm the issues about the defendant's conduct. And as we've said in our opening brief, this is the type of case where individual cases have been applied, and one of the plaintiff's attorneys in this case tried a very similar case in Missouri on behalf of five individuals, Sanford Brown students. The claim there is that they were deceived because they were told it would be easy to get a job, and they were deceived about how much they would make after graduation. Took a five-week trial, and after that, there was a verdict in favor of the defendants for four plaintiffs, and the fifth one got $8,000, nowhere near the $13 million they wanted. So what you heard here from counsel is how they want to present their case, which is in broad generalities and talking about everything but individual students. When you actually get down to it, though, what the individual students heard, why they decided, it all matters. And in fact, it's outcome determinative in many situations. And that's a powerful demonstration of the reason why this can't be a class action. Plaintiffs are not entitled to a presumption of causation, which is what they're really asking for here. And this court in Bemis said you don't get presumptions to get over the hurdle that you need on your burden of proof. And the defendants have a right, as the court also said in Bemis, of constitutional proportions to be able to go and put on the evidence with respect to each individual. I would say, in closing, that the fact that counsel admitted that people who got the education they anticipated, who were happy with it, who went ahead and got jobs in their field, are included in their class, and he apparently thinks they would be entitled to a full refund unless they opt out of the class, unless they choose not to participate. And that just shows how plaintiffs' theory cannot work under the Schools Act. Those people suffered no damages as a result of, if there were violations of the Act, they can't recover. And the only way to figure out who can recover here is to go individual by individual, which destroys the element of predominance. So we would ask you to reverse the decision. Thank you. Thank you all for your briefs and arguments.